**Starr DAWSON, Deborah Johnson, Deborah MacDonald, Pauline Deans, Deloris Cherry Velma Lee and Millicent McFarlane, Plaintiffs,**

**v.**

**COUNTY OF WESTCHESTER, William DeCuiceis, as the Warden of Westchester County Department of Corrections and Individually, Phillip Banks, as Sergeant and as a supervising employee of the County of Westchester and Individually, Rocco Pozzi, Commissioner of Corrections for the**

---

County of Westchester, Joseph Miranda, Chief of Operations, Department of Corrections, Robert L. Davis, Deputy Commissioner, Department of Corrections, County of Westchester, Defendants.

No. 01 CIV. 7218(WCC).

United States District Court,
S.D. New York.

July 25, 2003.

Joseph A. Maria, P.C., White Plains, NY (Frances Dapice Marinelli, of Counsel), for plaintiffs.

Charlene M. Indelicato, Westchester County Attorney, White Plains, NY (Shannon S. Brady, Josephine Trovini, Asst. County Attorneys, of Counsel), for Defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs Starr Dawson, Deborah Johnson, Deborah MacDonald, Pauline Deans, Deloris Cherry, Velma Lee and Millicent McFarlane brought this action against defendants County of Westchester (the "County") and the following personnel of the Westchester County Department of Corrections (the "Department"): 1) Warden William DeCuiceis;[1] 2) Sergeant Phillip Banks;[2] 3) Commissioner Rocco Pozzi; 4) Chief of Operations Joseph Miranda; and 5) Deputy Commissioner Robert L. Davis, alleging violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C.

§ 2000(e)), the First, Fifth and Fourteenth Amendments, 42 U.S.C.1983, § 45–c of the New York Civil Rights Law[3] and § 296 of the New York Executive Law. Defendants now bring this motion for summary judgment pursuant to FED. R. CIV. P. 56. For the reasons stated below, the motion is granted.

## BACKGROUND

In October of 1999, all of the plaintiffs were Correction Officers ("COs" or "CO") for the Department except for Johnson who was a Sergeant. (Defs. Rule 56.1 Stmt. ¶ 1.) During that time, the County had a policy against sexual harassment, which applied to the Department. (*Id.* ¶ 4.)

### I. The Letters

In early October of 1999, two letters apparently written by inmates were found by personnel of the Department. The first letter contained a drawing and sexually explicit language that referred to numerous female COs, including the plaintiffs. (*Id.* ¶ 16.) On or about October 7, 1999, CO Kelly Reckard[4] showed the letter to Deans, the first plaintiff to become aware of its existence.[5] (Deans Dep. at 21.) Deans showed the letter to MacDonald who made a copy and brought it to Johnson. (*Id.*) MacDonald and Johnson reported the letter to Warden DeCuiceis the same day.

1. DeCuiceis is also sued in his individual capacity.

2. Banks is also sued in his individual capacity as well as a Supervisor.

3. The Court notes that there is no § 45–c of the New York Civil Rights Law and assume plaintiffs meant § 40–c. *See* McKinney's Civil Rights Law § 40–c.

4. Reckard, who is also named in the letter but is not a plaintiff, became aware of the letter after observing COs Shelton, Casablanca, Holmes and Sgt. Martinez reading it. (Pls.Mem.Opp.Summ. J., Ex. 17.)

5. There is testimony from CO Joseph Young that at least one of the letters was already being circulated as early as October 1, 1999. He observed several copies of the letter on a desk in the main core and in the briefing room where supervisors report for assignments each day. He observed other COs "picking up the papers, reading them, then throwing them in the garbage." (Pls. Mem. Opp. Summ. J., Ex. 15; Banks Dep. at 26.)

(MacDonald Dep. at 14.) Sometime later, MacDonald showed the letter to Dawson, Cherry and McFarlane. (Pls. Mem. Opp. Summ. J., Ex. 21; Cherry Dep. at 11; Defs. Mem. Supp. Summ. J., Ex. F.)

The second letter, which also contained explicit sexual language referring to specific COs, including plaintiffs, was found by CO Donna Alford. (Pls.Mem.Opp.Summ. J., Ex. 16.) On October 8, 1999, Alford showed Deans the second letter in the presence of Banks, who had become aware of the letters through rumors that day but did not see the letters until Deans showed them to him. (Deans Dep. at 29.) Deans made a copy of each letter for him. (*Id.* at 31.) Banks told Deans he would try to help identify the writer of the letters and, if the writer was an inmate, transfer that inmate to the old jail. (Banks Dep. 73.) Deans later showed the second letter to Johnson who reported it to DeCuiceis on an unspecified date. (Johnson Dep. at 52, 59.)

Lee did not find out about the letters until she returned from vacation on October 11, 2003. (Pls. Mem. Opp. Summ. J., Ex. 25; Lee Dep. at 8.) According to Lee, upon entering the Correctional Facility, she saw Banks and CO Norman Bush standing together and she observed Banks giving Bush a piece of paper. (Lee Dep. at 9.) When Lee asked to see the piece of paper, Bush was hesitant to show it to her. Lee claims Banks said, "You made the top 15." (Pls.Mem.Opp.Summ. J., Ex. 25.) Banks encouraged Bush to show Lee the letter but asked Lee, "Do you have your sense of humor with you today?" (*Id.*) Lee was given the letter, read it and walked away. (*Id.*) As she was walking away, Lee claims Banks said to her, "At least yours was the mildest of them all." (*Id.*) Later, MacDonald showed Lee both letters. (*Id.*) Lee reported the incident

with Banks to CO Scott Delfa, a union representative, who spoke to Cpt. Soychek. (*Id.*) The only other statements Lee claims Banks made to her were "How are you Miss Lee" and "Everything all right with you today, Miss Lee?" (Lee Dep. 43.) These occurred in early November of 1999. (*Id.* at 42.)

According to Banks, he showed Lee the letter first and asked if it was okay to show it to Bush, whereupon Lee responded that she did not care. (Banks Dep. at 87.) At that point Bush read the letter. Banks denies making the statement "You made the top 15" and the comment about the mildness of the reference to Lee, but does acknowledge telling Lee that she had to have a sense of humor to read the letter. (*Id.* at 88.) [6]

According to Cherry, on October 11, 1999, while eating lunch in the mess hall, Banks and Sgt. Sheridan Reynolds sat down with her. (Pls.Mem.Opp.Summ. J., Ex. 23.) CO Middleton came into the mess hall and yelled to Banks, "Show me that letter, man." (*Id.*) Banks placed one of the letters on the table for Middleton to read and Cherry said to Banks, "I know what you're doing." (*Id.*) Cherry further testified that she had seen the letter before this incident but was unaware that Banks had a copy of it. (Cherry Dep. at 26.) She later reported this incident to Johnson. (Pls.Mem.Opp.Summ. J., Ex. 23.) Cherry further alleges that on several occasions Banks stopped and stared at her. (Cherry Dep. at 40.)

Banks' version of the incident is much different. He claims while having lunch with Cherry, he told her that he hoped that the letters were not getting her down. (Banks Dep. at 97.) He claims that Cherry said something to the effect that the

**6.** Bush never made a statement about the incident. (Pls. Rule 56.1 Stmt. ¶ 128.)

letter was a lie and that her breasts were not small as she cupped them with her hands. (*Id.*) Banks claims everyone laughed and Cherry walked away. (*Id.*)

McFarlane also claims to have had an offensive incident with Banks and apparently witnessed him giving other COs a copy of one of the letters. On approximately October 11, 1999, McFarlane was in the control area, often referred to as the "bubble," and Banks showed her a copy of the first letter. (McFarlane Dep. at 10.) She claims Banks and other unidentified COs were there and that the letter was "being circulated." (*Id.* at 12.) The manner in which the letter was being circulated, as described by McFarlane, is unclear:

Q: When you say the letter was being circulated, what do you mean by that?

A: Like— I can't remember exactly who was with him, but then, you know, they had different copies of the same letter.

Q: Did you see him giving copies to other people?

A: Officers. I don't know exactly which officer that was.

Q: You don't know any of the officers that you saw him hand it to?

A: (No verbal response.)

Q: How do you know that it was this letter that he was giving to the other officers?

A: Because the picture that's on the letter, okay, as opposed to reading exactly what it said.

Q: Did he give you a copy or did someone else give you a copy?

A: (No verbal response.)

(*Id.* at 12–13.)

On October 9, 1999, McFarlane was in the mess hall eating lunch with Banks and Reynolds. (McFarlane Dep. at 19; Pls. Mem. Opp. Summ. J., Ex. 24.) According to McFarlane, Banks asked her, "What other body parts do you have pierced?," referring to the sexually explicit letters. (McFarlane Dep. at 20; Pls. Mem. Opp. Summ. J., Ex. 24.) McFarlane responded, "I find this line of conversation offensive and I wish you to stop." (*Id.*) She made the same statement again to Banks when he again commented on her piercings. (*Id.*) Reynolds then told Banks to back off because McFarlane had complained about comments made by another CO before. (*Id.*) McFarlane complained to a sergeant about Banks' behavior and made a statement to the Special Investigative Unit ("SIU"). (McFarlane Dep. at 24.)

According to Banks, the comment he made to McFarlane at lunch was, "Millicent, don't you think that's excessive? What are you trying to do, cover your entire body with piercing jewelry?" (Banks Dep. at 101.) [7]

On October 11, 1999, CO R. Hittman, not a party to this action, claims that Banks showed him one of the letters. (Pls.Mem.Opp.Summ. J., Ex. 26.) Hittman reported this to Johnson and made a statement to the SIU. (*Id.*) Banks denies showing Hittman the letter. (Banks Dep. at 91.)

Also on October 11, 1999, CO Vernice Collins, also mentioned in the letters but not a party to this action, saw Banks as she arrived to work and he said to her, "You made the top 15 list."

7. A statement given by CO Reynolds is similar to Banks' version of the incidents involving Banks, Cherry and McFarlane and a statement by a cafeteria worker, Doritt Bhola, regarding the incident between Banks and McFarlane is also similar to Banks' version. (Defs. Reply Mem. Supp. Summ. J., Exs. A, B.)

(Pls.Mem.Opp.Summ. J., Ex. 35.) Collins did not know what that meant and Banks told her he would show the letters to her later. (*Id.*) When Collins saw Johnson later that day, Johnson showed her the letters and Collins mentioned Banks' comment. (*Id.*)

Around October 8, 1999, Dawson claims that Banks shouted at her down the hallway, "I want to show you something." (Dawson Dep. at 38.) She continued walking and did not see Banks again for him to show her anything. (*Id.*) She also claims Banks stared at her. (*Id.* at 39.)

Deans also claims to have been subjected to stares and comments by Banks. (Deans Dep. at 166–67.) Deans alleges that there were constant comments from other COs she could not identify such as, "When is your next day off, could we hook up?" and "I heard you suck a mean dick on your days off." (*Id.* at 50.) She also claims the inmates were disrespectful after the letters surfaced. (*Id.* at 51.)

Johnson claims to have felt harassed by the very presence of Banks. (Johnson Dep. at 128.) Johnson felt it was very difficult to perform her duties and that the workplace became intolerable due to the embarrassment and humiliation caused by the circulation of the letters. (*Id.* at 170.) She also felt betrayed that the County did nothing about it. (*Id.*) Further, she claims that other supervisors subjected her to the silent treatment. (*Id.* at 171.)

MacDonald claims to have been subject to silent treatment, isolation, stares and nasty looks by Banks and other COs. (MacDonald Dep. at 31.) Also, a male CO told MacDonald that other male COs wanted him to tell the women who were complaining about Banks to back off of him. (*Id.* at 59–60.)

On October 11, 1999, the plaintiffs along with other COs made a formal written complaint to DeCuieis, which they all signed. (Defs.Mem.Supp.Summ. J., Ex. H.) On approximately October 12, 1999, DeCuiceis submitted a written request for Special Investigation to Pozzi, which was authorized on approximately the same date. (Defs. Mem. Supp. Summ. J., Ex. I; Pozzi Dep. at 24.) The SIU interviewed all plaintiffs and at least eleven other officers, supervisors and civilian staff. (Defs.Mem.Supp.Summ. J., Ex. E.) SIU reported its findings to Anthony Czarnecki, Special Assistant to the Commissioner, who submitted a report with recommendations to Pozzi around November 23, 1999. (*Id.*, Exs. E, K.) After a discussion with his staff, Pozzi requested two additional interviews. (Czarnecki Dep. at 137, 146.) A second report by SIU was submitted and Czarnecki prepared a follow-up report with recommendations for Pozzi. (Defs.Mem.Supp.Summ. J., Exs.L, M.) Pozzi then ordered that Banks be formally counseled for not bringing the letters to the attention of a higher authority and attempting to conduct an investigation on his own. (Pozzi Dep. 53–54.) After formal counseling, Banks was transferred to the penitentiary in June of 2000. (Banks Dep. at 167.)

## II. *Retaliation*

Cherry claims she was retaliated against because on May 11, 2000 she received a memo from Assistant Warden Robert L. Page regarding formal counseling for her conduct in the mess hall with relation to the offensive letters. (Pls.Mem.Opp.Summ. J., Ex. 62.) That day, Cherry met with Page for counseling, but when Cherry inquired as to why she was being counseled, Page said he did not know. (*Id.*, Ex. 63.) Cherry submitted a job injury claim on May 16, 2000, asserting that she was upset by being subjected to the formal counseling. (*Id.*, Ex. 64.) In June 2000, Cherry began treatment for

anxiety, depression and stress. (*Id.*, Ex. 66.)

On October 19, 1999, Dawson submitted a job injury claim and was out of work from October 19, 1999 to July of 2001. (*Id.* at 66.) She felt she was being retaliated against because she received phone calls and home visits from SIU while on job injury leave, which had never happened before. (*Id.* at 98.) She also was directed to appear at a hearing to determine whether she was eligible to continue receiving her wages and medical care and treatment. (*Id.* at 104.) Dawson was diagnosed as having a generalized anxiety disorder and later an adjustment disorder with mixed emotional features and Zoloft was prescribed. (Pls.Mem.Opp.Summ. J., Exs.30, 31, 34.) The County's doctor also recommended limited contact with Banks. (*Id.* at 31.)

Asserting that she felt stressed due to the circulation of the letters, MacDonald submitted a job injury claim on October 21, 1999. (Pls.Mem.Opp.Summ. J., Ex. 45.) She began treatment for anxiety and depression and was later treated for major depressive disorder with mixed anxiety and depressed mood. (*Id.*, Ex. 48.) On November 12, 1999, the County's psychiatrist found that MacDonald could return to work but suggested that contact with Banks be kept to a minimum. (*Id.*, Ex. 49.) MacDonald was also required to attend a hearing to determine her eligibility for the continuing payment of wages and for medical care and treatment. (*Id.*, Ex. 50.) It was found that MacDonald was medically unable to return to work and after more psychiatric evaluations by the County's psychiatrist, it was found that MacDonald's mental condition prevented her from returning to work. (*Id.*, Exs. 51–52.)

Deans submitted a job injury claim on November 17, 1999 because she felt she could no longer work due to the distribution of the letters and failure of the defendants to change the environment. (Deans Dep. at 82; Pls. Mem. Opp. Summ. J., Ex. 54.) She was out of work from November 18, 1999 until June of 2001. (Deans Dep. at 81.) During this time she was treated for anxiety, stress and depression. (*Id.*) She also claims that the defendants retaliated against her as a result of her job injury claim. Deans was brought up on charges of insubordination and disobeying a direct order for refusing to work overtime on November 6, 1999. (Pls.Mem.Opp.Summ. J., Ex. 60.) Deans met with union representatives and never heard anything more about the charges. (Deans Dep. at 144.) Further, Deans received notification of a hearing to determine her eligibility for the continued payment of wages and medical care and treatment but according to Deans, the hearing never proceeded. (Pls. Mem. Opp. Summ. J., Ex. 61; Deans Dep. at 198.) In addition, Deans claims to have been subjected to home visits by SIU, something that had not occurred when she was on job injury leave due to a physical injury in 1992. (Deans Dep. at 177.)

On October 25, 1999, Johnson put in a claim for job injury due to the circulation of the letter. (Pls.Mem.Opp.Summ. J., Ex. 37.) She was out of work from October of 1999 to September 18, 2000. (Pls. Rule 56.1 Stmt. ¶ 67.) Johnson feels she was retaliated against because she was subject to multiple home visits and phone calls by SIU, which had never happened before. When she did return to work, she was transferred to the Women's Unit, which she claims had never happened to anyone else. (Johnson Dep. at 127–28.) Further, Johnson claims to have had an agreement with the County that she would be notified whenever Banks would be working in the Women's Unit. (*Id.* at 128.) When John-

son returned to work, Banks entered the Women's Unit, but Johnson had not been previously notified. (*Id.*) When she called to complain, she was notified that they would no longer be notifying her of his presence. (*Id.*) Moreover, Banks was present during Johnson's deposition, the only deposition he attended. (Pls. Rule 56.1 Stmt. ¶ 72.) Johnson is being treated for anxiety and depression and takes anti-depression medication. (Pls.Mem.Opp.Summ. J., Ex. 39.)

## DISCUSSION

### I. *Summary Judgment Standard*

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in her favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994).

### II. *Title VII Sexual Harassment*

 Title VII requires employers to provide an atmosphere free of sexual abuse or hostility. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In order to succeed on a hostile work environment claim, the plaintiff must show that the workplace was so ridden "with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Harris v. Forklift Sys.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Plaintiff must also show that there is a specific basis for imputing the conduct to the employer. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). The victim must not only perceive the environment as subjectively hostile, but the environment must be such that a reasonable employee in the person's shoes would perceive it as hostile. *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367; *Torres v. Pisano,* 116 F.3d 625, 631 (2d Cir.1997).

 The Supreme Court has provided guidance and established a non-exclusive list of factors that should be weighed when determining whether a workplace is permeated with discrimination. *Harris,* 510 U.S. at 23, 114 S.Ct. 367. These factors include: (1) the frequency and severity of the conduct; (2) whether the conduct was physically threatening, humiliating or merely an offensive utterance; (3) whether it unreasonably interferes with the employee's job performance; and (4) the effect on the employee's psychological well-being. *Id.* Although one encounter may constitute a hostile work environment, conduct that can be categorized as a few isolated incidents, teasing, casual com-

ments or sporadic conversation will not be deemed to create a hostile work environment. . *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir. 1998); *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986). In other words, "[w]hether the sexual harassment constitutes a Title VII violation is determined from the totality of the circumstances." *Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 577–78 (2d Cir.1989).[8]

■■■ In this case it appears clear that plaintiffs subjectively felt that there was a hostile work environment. (Defs. Mem. Supp. Summ J., Ex. H.) The next inquiry then is whether a reasonable employee in the plaintiffs' shoes would perceive it as hostile. Taking the facts in the light most favorable to the nonmovants, Banks showed the letter to three male COs, Middleton, Hittman and Bush, and two of the plaintiffs, McFarlane and Lee.[9] Also, while it seems McFarlane saw Banks distribute the letters to other COs, her deposition testimony is very unclear. *See supra* Part I. However, for the purpose of this motion, we will take her testimony in the light most favorable to the nonmovant and assume that she did in fact see Banks giving copies of the letter to other COs.

The statements made by Banks to individual plaintiffs between October 8, 1999 and October 11, 1999 include: 1) "You made the top 15;" 2) "Do you have your sense of humor with you today?;" 3) "At least yours was the mildest of them all;" 4) "What other body parts do you have pierced?;" and 5) "I want to show you something." In early November, Lee alleges Banks said, "How are you Miss Lee?" and "Everything all right with you today, Miss Lee?" Other behavior by Banks which some plaintiffs describe as creating a hostile work environment include his stopping and staring at them or just being in their vicinity.

Plaintiffs also allege that the behavior of other COs contributed to the hostile work

**8.** Defendants argue in their Reply Memorandum that the "totality of the circumstances" test merely requires that all of the alleged circumstances be considered as a whole and it does not require that the plaintiffs themselves be considered as a whole. (Defs. Reply. Mem. Supp. Summ. J. at 7.) We note that "because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000).

**9.** In plaintiffs' Rule 56.1 Statement ¶ 26, they state that "Banks directed Correction Officer, Carol Merrell, to make copies of said letters to distribute to employees in the booking office." The Court notes that the exhibits which plaintiffs cite do not support this statement. Merrell herself denies she was directed by Banks to make copies, a transcript the plaintiffs failed to cite or include but was provided by defendants. The woman who supposedly witnessed Merrell making the copies, Leslie Black–Askew, only recalled being in the booking room while others were looking at the letter and did not recall Merrell making copies. (Merrell Dep. at 15; Black–Askew Dep. at 19.) The only person who supports the allegation that Merrell made copies is Johnson, who testified during her deposition that Black–Askew told her that she witnessed Merrell take the letter "out of [Banks'] hand and made copies." (Johnson Dep. at 70.) Even if this statement could be considered, there is still no indication that Banks directed Merrell to do this as alleged by plaintiffs. The statement, however, is hearsay because it is an out of court statement offered for its truth and will not be considered on a motion for summary judgment. *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997) ("[I]t is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgement."); *Evans v. Port Auth. of N.Y. & N.J.,* 192 F.Supp.2d 247, 264 (S.D.N.Y.2002).

environment. Specifically, plaintiffs allege that their coworkers would stare and whisper, make comments or stop talking when plaintiffs entered the room. Deans remembered specific comments such as "When is your next day off, could we hook up?" and "I heard you suck a mean dick on your days off," but did not remember who said these statements. This last mentioned statement, while inexcusably crude and offensive and far more reprehensible than the usual relatively harmless banter, was never reported and the speaker was never identified.

The question is whether all of these statements and actions considered together are sufficiently severe or pervasive to alter the conditions of the plaintiffs' employment and create an abusive work environment. Banks' distribution of the letters and making comments about them occurred in a three-day period while comments by COs as well as stares and nasty looks from Banks continued after plaintiffs complained to the County. However,

> [a] female employee need not subject herself to an extended period of demeaning and degrading provocation before being entitled to seek the remedies provided under Title VII. It is not how long the sexual innuendos, slurs, verbal assaults, or obnoxious course of conduct lasts. The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive.

*Carrero*, 890 F.2d at 578.

■ Certainly, the offensiveness of the individual actions should be examined beyond simply the time period in which they occurred. The comments by Banks were relatively benign as they only made reference to the existence of the letters. His one comment that could be construed as sexual is "What other body parts do you have pierced?" Moreover, merely stopping and staring, behavior plaintiffs never reported, does not rise to the level of a hostile work environment, because there was no actual or threatened physical touching. *Lamar v. Nynex*, 891 F.Supp. 184, 185 (no hostile environment where supervisor told plaintiff she "looked really hot," made vulgar remarks and stared at her in a hostile manner); *Legnani v. Alitalia Linee Aeree Italiane*, 1997 WL 642556, at *3 (S.D.N.Y. Oct.16, 1997) (no hostile work environment where there was no physical contact, verbal abuse or unwanted sexual advances).

Behavior of coworkers, while described as constant, is vague at best as the only testimony of specific sexual language is from Deans who could not identify the speaker or when it occurred, nor did she report it. We conclude that Banks' actions taken as whole, including the distribution of the letters, which were already circulating through the Department before Banks became aware of their existence, his statements about the letters, with only one statement having a specific sexual connotation, and staring at some of the plaintiffs are not sufficiently severe or pervasive to alter the conditions of the plaintiffs' employment and create an abusive work environment.

Plaintiffs chose a career as correctional officers in male correctional institutions where they would be in close contact with prisoners, men not distinguished for commendable deportment or courtly display of social graces. It is clearly not a suitable occupation for women of unusually delicate sensitivity. Those who choose it must expect to be exposed at least occasionally to an embarrassing remark or situation. In this case two sexually explicit and offensive letters, apparently written by inmates, were found and circulated by male COs. Plaintiffs did not have to read them, but elected to do so, and even to make

copies and distribute them to others. The comments about the letters made to them by male COs amounted to no more than innocuous badinage of the type to be expected between coworkers of different sexes. The one truly outrageous remark, made by an unidentified CO, was directed only at plaintiff Deans and, so far as the record shows, heard by no one else. It is difficult to believe that these incidents really rendered the workplace atmosphere so emotionally devastating to work-hardened female COs that several of them were disabled from work for lengthy periods, one for seven months and another for twenty months. During these work injury leaves, their base pay apparently continued, which obviously removed a strong incentive to return to the job. The Court cannot conclude that the work environment was so abusive or hostile that plaintiffs are entitled to still further compensation by way of monetary damages.

Defendants' motion for summary judgment with respect to this claim is therefore granted.

## III. *Retaliation*

Plaintiffs allege that they were retaliated against for complaining about Banks' behavior. Specifically, 1) Dawson, MacDonald and Deans had to attend hearings to determine their eligibility for the continued payment of wages and medical care and treatment, 2) Cherry had to attend formal counseling for her conduct in the mess hall as it related to the offensive letters, 3) Deans was brought up on disciplinary charges for refusing to work overtime, 4) Johnson was transferred to the Women's Unit upon her return to work, and 5) Dawson, Deans and Johnson received numerous phone calls and home visits from SIU while on work injury leave.

Title VII prohibits an employer from "discriminating against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e–3(a). The goal is " 'to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice.' " *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.1998) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988)).

A claim of retaliation is subject to a three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, plaintiff must make out a prima facie case of retaliation. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996). If the plaintiff does so, the defendant has the burden of articulating a legitimate, non-retaliatory reason for the complained of action. *Id.* If the defendant meets this burden, the plaintiff must present evidence sufficient to raise a factual issue as to whether the defendant's reason was merely a pretext for retaliation. *Id.*

To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity by opposing a practice made unlawful by Title VII; (2) the employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse action. *Ramos v. Marriott Int'l Inc.*, 134 F.Supp.2d 328, 346 (S.D.N.Y.2001) (Conner, J.).

Plaintiffs have failed to make out a prima facie case of retaliation. There is no disagreement between the parties that the plaintiffs engaged in a protected activity and that defendants were aware of that activity. The question centers on whether

plaintiffs have shown they were subjected to adverse employment actions. We find that they have not.

■ Adverse employment actions may be indicated by a "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)). Lesser action may also meet the threshold for adverse action, but, because there are no bright line rules, the Second Circuit acknowledged, "courts must pore over each case to determine whether the challenged employment actions reaches the level of 'adverse.'" *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997). However, "a mere inconvenience or an alteration of job responsibilities" will not be considered materially adverse. *Galabya*, 202 F.3d at 640.

■ The Second Circuit has held that the filing of disciplinary charges does not constitute an adverse employment action where they have not yet been adjudicated. *Yerdon v. Henry*, 91 F.3d 370, 378 (2d Cir.1996).[10] Cherry was only required to attend one counseling session and nothing ever came of the disciplinary charges filed against Deans. Therefore, they have not shown they were subjected to adverse employment actions.

■ Further, "not all employee transfers are tantamount to an adverse employment action, even if they are involuntary." *Ayiloge*, 2002 WL 1424589, at *11. Here, Johnson has not shown any evidence that the transfer constituted an adverse employment action. She has not demonstrated a change in duties, pay, title or responsibilities. Accordingly, Johnson's transfer to the Women's Unit was not an adverse employment action.

■ Moreover, the hearings to determine eligibility and the home visits and phone calls by SIU also do not constitute adverse employment actions based on the very obvious fact that nothing adverse happened with respect to plaintiffs' employment. Plaintiffs claim that they were retaliated against because they were required to attend a hearing,[11] not that they lost wages, benefits, title or responsibilities as a result of the hearing.[12] In fact, both Dawson and MacDonald were found to be unable to return to work by the hearing

10. One Southern District case seems to indicate that the filing of disciplinary charges alone against an employee may constitute an adverse employment action. *Garrett v. Mazza*, No. 97 Civ. 9148, 2001 WL 123862, at *3 (S.D.N.Y. Feb.13, 2001). Another Southern District case held that the filing of disciplinary charges constituted an adverse employment action because the charges led to one adverse finding which could carry a stigma and affect future employment. *Ayiloge v. City of New York*, 2002 WL 1424589, at *12 (S.D.N.Y. June 28, 2002). Regardless, we choose to follow the Second Circuit.

11. This hearing is provided for in the collective bargaining agreement between the County and the Westchester County Correction Officers Benevolent Association, Inc. (Pls. Mem. Opp. Summ. J., Exs. 29, 50, 61 (referring to App. B, p. 4, § G, ¶ 4 of the collective bargaining agreement)).

12. We note that any anxiety associated with the hearings is not considered a materially adverse change in employment for purposes of Title VII. *Jenkins v. Fischer*, 2002 WL 205674, at *6 (S.D.N.Y. Feb.8, 2002) (quoting *Davis v. City Univ. of New York*, No. 94 Civ. 7277, 1996 WL 243256, at *8 (S.D.N.Y. May 9, 1996) ("'[I]nchoate matters such as a plaintiff's embarrassment or anxiety' generally do not qualify as a 'materially adverse' change in employment.")).

officer.[13] Further, according to Pozzi, employees on work injury claims are responsible for being at home from the hours of 9:00 am to 5:00 pm and are subject to visitations to be sure they are complying with that policy. (Pozzi Dep. at 65.) Even if these visits and phone calls could be considered excessive, there was no adverse employment action.

Accordingly, defendants' motion for summary judgment with respect to plaintiffs' retaliation claim is granted.

## IV. *Section 1983 Claims*

A plaintiff may file suit under § 1983 against any individuals acting under color of state law which caused him or her to be deprived "of any right, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *Brown v. Middaugh*, 41 F.Supp.2d 172, 190 (N.D.N.Y.1999); *Sykes v. James*, 13 F.3d 515, 519 (2d Cir.1993) ("Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."). Plaintiffs allege in their Complaint that their First, Fifth and Fourteenth Amendments were violated. (Pls. Mem. Opp. Summ. J., Ex. 1.) Plaintiffs' opposition papers, however, do not address state action nor these Amendments specifically. Nevertheless, we will assume there is state action and examine whether plaintiffs' constitutional rights were violated.

■ "A plaintiff making a First Amendment retaliation claim under § 1983 must initially demonstrate by a preponderance of the evidence that: 1) his speech was constitutionally protected, 2) he suffered an adverse employment decision, and 3) causal connection exists between his speech and the adverse employment determination against him." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999). Even if it could be determined that plaintiffs' speech was constitutionally protected, they suffered no adverse employment action and therefore cannot bring a § 1983 claim for a First Amendment violation.

■ To state an equal protection violation, plaintiffs must demonstrate that: 1) compared with others similarly situated, they were selectively treated and 2) that selective treatment was motivated by an intent to discriminate on the basis of impermissible considerations, such as gender. *Crowley v. Courville*, 76 F.3d 47, 52–53 (2d Cir.1996). Because plaintiffs have set forth no evidence to show that they were treated differently than others similarly situated, their § 1983 claim for Fifth and Fourteenth Amendment violations are dismissed.[14]

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted in its entirety.

SO ORDERED.

---

**13.** Deans testified that her hearing never took place. (Deans Dep. at 198.)

**14.** Because the federal claims have not survived the motion for summary judgment, we decline to exercise pendent jurisdiction over the state law claims. *McDermott v. Town of Windham Pub. Sch.*, 225 F.Supp.2d 180, 184 (D.Conn.2002).