373 F.3d 265
 Starr DAWSON, Deborah Johnson, Deborah MacDonald, Pauline Deans, Deloris Cherry, Millicent McFarlane, and Velma Lee, Plaintiffs-Appellants,
v.
COUNTY OF WESTCHESTER, William Decuiceis, Warden, Phillip Banks, Sergeant, Rocco Pozzi, Commissioner of Corrections, County of Westchester, Joseph Miranda, Chief of Operations and Robert L. Davis, Deputy Commissioner, Defendants-Appellees.
 Docket No. 03-7858.
 United States Court of Appeals, Second Circuit.
 Argued: March 3, 2004.
 Decided: June 14, 2004.
 
 COPYRIGHT MATERIAL OMITTED Joseph A. Maria, White Plains, New York (Frances Dapice Marinelli, on the brief), for Plaintiff-Appellants.
 Mary Lynn Nicolas, Westchester County Attorney's Office, White Plains, New York, for Charlene M.
 Indelicato, Westchester County Attorney (Stacey Dolgin-Kmetz, Chief Deputy County Attorney, and Linda M. Trentacoste, Associate County Attorney, on the brief), for Defendants-Appellees.
 Before: VAN GRAAFEILAND, LEVAL, and CALABRESI, Circuit Judges.
 CALABRESI, Circuit Judge:
 
 
 1
 Female corrections officers at a male correctional facility in Westchester County filed suit in the United States District Court for the Southern District of New York, alleging that the County of Westchester, a sergeant at the Westchester facility, and various county corrections officials subjected them to a hostile work environment and retaliated against them in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and New York anti-discrimination laws, N.Y. Civ. Rts. Law § 40-c; N.Y. Exec. Law § 296. In a decision and order dated July 25, 2003, the district court (William C. Conner, J.) granted summary judgment to the defendants on all of plaintiffs' federal claims, and declined to exercise pendent jurisdiction over their state law claims. Plaintiffs now appeal. We affirm the district court's dismissal of plaintiffs' Title VII and Section 1983 retaliation claims, but vacate its grant of summary judgment on plaintiffs' claims of hostile work environment discrimination under Title VII and Section 1983, and remand these causes of action for further proceedings. Accordingly, we also vacate the district court's dismissal of plaintiffs' state law claims, and remand those claims to the district court as well.
 
 
 I. Factual Background
 
 
 2
 Plaintiffs-appellants Starr Dawson ("Dawson"), Deborah MacDonald ("MacDonald"), Pauline Deans ("Deans"), Deloris Cherry ("Cherry"), Millicent McFarlane ("McFarlane"), and Velma Lee ("Lee") were female corrections officers ("COs") employed at a male correctional facility (the "facility") in Westchester County. Plaintiff-appellant Deborah Johnson ("Johnson") and defendant-appellee Phillip Banks ("Banks" or "Sgt. Banks") were both sergeants at the facility, a rank superior to that of CO.
 
 
 3
 The events at the center of this suit began on or about October 7, 1999, when CO Kelli Reckard gave Deans a letter ___ apparently written by inmates at the facility ___ addressed to all female COs. The typed document contained degrading, explicit, and violent sexual references to individual female COs, including the plaintiffs, Reckard, and others. It also featured an obscene drawing. Deans showed the letter to MacDonald, who made photocopies for Dawson and Johnson. MacDonald and Johnson gave a copy of the document to Warden William DeCuiceis ("DeCuiceis"), who said he would investigate the matter.
 
 
 4
 On or about October 8, a second letter of a similar sort was found in the facility. CO Donna Alford showed it to Deans, who gave a copy to Sgt. Banks, apparently at his request. The parties agree that Banks expressed indignation at the letters and told Deans that if their author could be identified, Banks would have him transferred and written up. According to his own testimony, however, Banks never reported the letters to his captain or to the warden.
 
 
 5
 Plaintiffs allege that Sgt. Banks was responsible for the subsequent dissemination of the letters throughout the facility. On October 10 or 11, plaintiffs assert, Banks circulated the letters among various personnel in the mess hall. Cherry testified in her deposition that she witnessed CO Middleton asking Sgt. Banks to show him "that" letter, and that after Banks complied, Cherry told him, "I know what you are doing," i.e., distributing the letters. Upset, Cherry reported the incident to Johnson. In his deposition, Banks gave a different account of his encounter with Cherry in the mess hall. He testified that Cherry had approached the table where Banks was eating with Sgt. Reynolds, and that Banks had said, "`You look down[,] Cherry. I hope those letters aren't getting you down," to which she responded in the negative and joked that the authors of the letter were mistaken about the size of her breasts.
 
 
 6
 McFarlane also testified that she saw Sgt. Banks showing what she believed were copies of the letters to other officers in an area of the jail known as the "bubble." Plaintiffs further contend that Banks directed CO Carol Merrill to make copies of the letter for distribution to personnel in the facility's booking office.[1] MacDonald alleges that a Sergeant Hittman informed her that Banks was disseminating the letters to other personnel in the control or "tac" room.
 
 
 7
 Plaintiffs complain of various inappropriate remarks by Sgt. Banks in connection with the letters. Thus, McFarlane alleges, on October 11 Banks asked her in the presence of Sgt. Reynolds "what other body parts [did she] have pierced," to which McFarlane responded, "I find this line of conversation offensive and I wish you would stop." When Banks repeated the question, and McFarlane gave a similar answer, Reynolds advised Banks to cease and desist, warning him that McFarlane had filed a harassment complaint against another officer in the past. McFarlane reported her encounter with Banks in a statement to the facility's Special Investigations Unit ("SIU") on October 15.[2]
 
 
 8
 Also on October 11, Lee returned from vacation and allegedly witnessed Sgt. Banks giving a piece of paper to CO Bush in the lobby of the Department of Corrections. According to Lee, Banks said to her, "I see you made the top 15," asked Lee if she "had her sense of humor" with her, and told Bush to show her the letter. Lee claims that Banks commented to her, "At least [yours] was the mildest of them all." Lee reported this incident to a union representative, another CO, and two captains, and wrote a statement for the SIU. Other female COs apparently reported to Johnson that Banks made similar "top 15 list" remarks to them, and Johnson testified that she advised Warden DeCuiceis that Banks was distributing the letters throughout the facility. Several of the plaintiffs contend that Banks would stop and stare inappropriately at them, and Lee claims that Banks approached her work area unnecessarily to ask, "How are you, Miss Lee? Everything all right with you today, Miss Lee?"
 
 
 9
 Plaintiffs claim that, as a result of the letters' dissemination, they were subjected to a barrage of inappropriate stares, whispers, laughter, and remarks from their colleagues. Thus, Deans alleges that after the letters circulated throughout the facility, male officers made countless lewd and demeaning comments to her. Deans described "constant stuff being said that had no business in the workplace," including sexually charged references to her physical appearance. The atmosphere grew worse, Deans said, when she returned from a scheduled two-week vacation. Remarks were then made such as "Did you enjoy your vacation? We hear you [...] a mean dick on your days off," "When is your next day off, could we hook up?" and "I'll take you to Victoria's Secret and you can get whatever you want as long as you wear it for me."
 
 
 10
 Dawson, too, testified that male officers taunted her with comments such as "is it true you're about that, you do things like [the sexual acts described in the letters]? Ew, that's nasty, you're nasty." She recalled that at morning briefings after the letters circulated, officers, mostly male, gathered in groups and laughed about their contents, and that the letters were a prevalent topic of conversation for civilian workers at the facility as well.
 
 
 11
 The plaintiffs also report that the dissemination of the letters led to a diminution of their authority over the facility's inmates. Deans asserted that while she had never experienced problems with inmates in the past, after the letters "[i]t became difficult to ... tell them the littlest thing, clean your room, and [they would give me] attitude."
 
 
 12
 The plaintiffs sought and received medical treatment for various mental health problems allegedly resulting from stress caused by the letters and their impact on the plaintiffs' workplace environment. Some took job injury leave; others continued to work while receiving treatment.
 
 
 13
 The record reveals that the defendants did take steps to investigate both the letters' source and plaintiffs' complaints about Sgt. Banks's subsequent behavior. On October 9, shortly after the letters were found in the facility, Sergeant Bizzarro filed a Special Report indicating that he had interviewed a commissary staff member who had found one of the letters in the commissary bin.[3] On October 11, plaintiffs and other female employees submitted a written complaint to Warden DeCuiceis regarding the letters, Sgt. Banks' distribution of them, and the hostile work environment plaintiffs perceived. The female officers requested Banks' immediate suspension and called for formal charges of sexual harassment to be filed against him. On October 12, DeCuiceis asked Commissioner Rocco Pozzi to authorize a special investigation based on the October 11 complaint. Pozzi approved the request, instructed that the investigation be expedited, and referred the matter to his Special Assistant, Anthony Czarnecki, for assignment to the SIU on October 13. Subsequently, various female COs, including plaintiffs, made statements to the SIU in connection with the letters and their dissemination.
 
 
 14
 On November 15, 1999, the SIU submitted a report to Czarnecki, concluding that "it appears that Sgt. Banks did not investigate anything related to these letters. If anything, he just continued to show them to other people creating an atmosphere of distrust and frustration to the women described in the letters." Czarnecki reviewed the SIU report and submitted a recommendation to Commissioner Pozzi on November 23. Czarnecki found that "it appears that Sgt. Banks failed to report the slanderous letter to a higher-ranking authority, failed to conduct any credible investigations about its authorship or circulation, engaged in inappropriate conversations with supervisors and officers about the contents/targets of the defamatory letter, and essentially abandoned his duties as a supervisor." Noting that several female officers had claimed stress-related job injuries and alleged a hostile and offensive work environment, he recommended that Banks face formal disciplinary action for misconduct, negligence, and sexual harassment, and that Banks be transferred out of the Jail Division immediately.
 
 
 15
 After obtaining two additional statements from interviewees, the SIU issued a second report on February 18, 2000. The report noted that Officer Joseph Young had stated that he saw stacks of copies of the obscene letters on a desk in the "tac room," but that he had not observed Banks distributing the copies.[4] On March 9, Czarnecki prepared a new summary for Pozzi. In it, Czarnecki concluded that there was at least one other sergeant in addition to Banks who failed to take appropriate action, and that several other COs had engaged in misconduct. While Czarnecki's recommendations had changed somewhat from those of his initial report, his recommendation that Banks be formally counseled and transferred stood. Subsequently, Pozzi apparently ordered that Banks be formally counseled for failing to bring the letters to the attention of a higher-ranking officer in the chain of command, and for attempting to conduct an investigation that should have been handled by SIU. According to defendants, after being formally counseled by DeCuiceis, Banks was transferred to the Penitentiary Division in June 2000.
 
 
 16
 In addition to their hostile work environment claims, several of the plaintiffs also allege that they suffered from various adverse employment actions in retaliation for their complaints of harassment. Cherry asserts that the formal counseling she received after her encounter with Banks in the mess hall was retaliatory. Dawson, Deans, and Johnson claim that they were subjected to excessive phone calls and home visits while on job injury leave. Dawson, Deans, and MacDonald complain that they were directed to appear at hearings to determine their continued eligibility for wages and medical benefits while on leave. Deans contends that charges of insubordination and disobeying a direct order for refusing to work overtime in November 1999 were retaliatory. Johnson claims that her transfer to the women's facility after she returned to work from her injury leave was retaliatory.[5]
 
 
 17
 Finally, the plaintiffs argue that the allegations stated above also support claims of retaliation for speech on a matter of public concern, in violation of the First Amendment, and discrimination in violation of the equal protection clause of the Fourteenth Amendment, see 42 U.S.C. § 1983.
 
 
 II. The District Court's Decision
 
 
 18
 The district court granted defendants' motion for summary judgment on all of plaintiffs' federal claims. Acknowledging that plaintiffs "subjectively felt there was a hostile work environment," and accepting arguendo that Banks had participated, at least to some degree, in the dissemination of the letters, the court found that the alleged comments by plaintiffs' co-workers — apart from one particularly crude utterance directed at Deans ___ "amounted to no more than innocuous badinage of the type to be expected between coworkers of different sexes." Dawson v. County of Westchester, 274 F.Supp.2d 364, 374, 376 (S.D.N.Y.2003). This conduct, the court ruled, was not sufficiently severe or pervasive to create an unlawfully hostile work environment.
 
 The court also stated:
 
 19
 Plaintiffs chose a career as correctional officers in male correctional institutions where they would be in close contact with prisoners, men not distinguished for commendable deportment or courtly display of social graces. It is clearly not a suitable occupation for women of unusually delicate sensitivity. Those who choose it must expect to be exposed at least occasionally to an embarrassing remark or situation.... It is difficult to believe that these incidents really rendered the workplace atmosphere so emotionally devastating to work-hardened female COs that several of them were disabled from work for lengthy periods.... Id. at 375-76.
 
 
 20
 The court also noted that "several of" the plaintiffs took lengthy work injury leaves, during which "their base pay apparently continued, which obviously removed a strong incentive to return to the job." Id. at 376. Under such circumstances, the court could not "conclude that the work environment was so abusive or hostile that plaintiffs are entitled to still further compensation by way of monetary damages." Id.
 
 
 21
 Additionally, after finding that none of the plaintiffs had shown sufficient evidence that any of the alleged retaliatory steps constituted an adverse employment action, the district court granted summary judgment on plaintiffs' retaliation claims. Finally, the court rejected plaintiffs' First Amendment and equal protection claims, and declined to exercise jurisdiction over their state law claims. It therefore dismissed both the federal and state claims, the latter without prejudice.
 
 
 III. Discussion
 
 
 A. Standard of Review
 
 
 22
 We review the district court's grant of a motion for summary judgment de novo. Giano v. Senkowski, 54 F.3d 1050, 1052 (2d Cir.1995). Summary judgment is appropriate only where there are no disputed issues of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also Fed.R.Civ.P. 56(c). In reviewing grants of summary judgment, we may "not... weigh the evidence, but [are] instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Weyant v. Okst, 101 F.3d 845, 854 (2d Cir.1996) (citing Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505). As such, the non-movants — in this case, the plaintiffs — "will have [their] allegations taken as true, and will receive the benefit of the doubt when [their] assertions conflict with those of the movant." Samuels v. Mockry, 77 F.3d 34, 36 (2d Cir.1996) (internal quotation marks omitted). Still, "[t]he mere of existence of a scintilla of evidence in support of the [plaintiffs'] position will be insufficient; there must be evidence on which the jury could reasonably find for the [plaintiffs]." Liberty Lobby, 477 U.S. at 252, 106 S.Ct. 2505.
 
 
 A. Retaliation Claims
 
 
 23
 Plaintiffs assert that defendants retaliated against them, in violation of Title VII, Section 1983, and the First and Fourteenth Amendments, for complaining of the harassment they allege. We agree, for substantially the reasons stated by the court below, that summary judgment for defendants on these retaliation claims was appropriate, and AFFIRM its ruling with respect to them.
 
 
 B. Hostile Work Environment Claims
 
 
 24
 "When the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks and citations omitted). Courts look to the totality of the circumstances in determining whether a plaintiff has established a hostile work environment claim, considering factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23, 114 S.Ct. 367. While each of these elements is relevant to the inquiry, "no single factor is required." Id. "Because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim," Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir.2000).
 
 
 25
 We have noted that "[t]he fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." Torres v. Pisano, 116 F.3d 625, 631 (2d Cir.1997). "[A] mild, isolated incident does not make a work environment hostile...." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir.2000). The test is whether the harassment is of "such quality or quantity" as to meet the standard of "severe or pervasive" harassment or abuse. Id.
 
 
 26
 The court below found that the harassment alleged in this case was "not sufficiently severe or pervasive to alter the conditions of the plaintiffs' employment and create an abusive work environment." Dawson, 274 F.Supp.2d at 375. The district court's opinion notes that plaintiffs' chosen occupation necessarily places them in the company of prison inmates, "men not distinguished for commendable deportment or courtly display of social graces," and that as a result, exposure to an occasional "embarrassing remark or situation" is to be expected. Id.
 
 
 27
 It is true that male prisoners may not be decorous practitioners of formal etiquette. Indeed, the obscenely misogynist nature of the letters at issue in this case suggests just how far jailhouse expression may stray beyond the boundaries of common decency. But such behavior by prisoners is not, and cannot be, the benchmark against which to measure the conduct of plaintiffs' own colleagues.[6]
 
 
 28
 Indeed, in the prison context especially, officers must depend upon their co-workers for mutual protection and rely upon them for their own ability to assert authority over others in potentially dangerous situations. In such a setting, actions of co-officers and superiors that undermine an officer's sense of personal safety or compromise her capacity to command respect and obtain compliance from co-workers, subordinates, and inmates assume greater, not lesser, significance. Cf. Howley v. Stratford, 217 F.3d 141, 154 (2d Cir.2000) (recognizing, in a case involving a male firefighter's sexually charged and threatening tirade against a female officer, that "the fomenting of gender-based skepticism ... may easily have the effect ... of diminishing the respect accorded the officer... and thereby impairing her ability to lead in the life-threatening circumstances often faced by firefighters"). And, female officers may be particularly vulnerable to such diminution of authority in circumstances such as these, not because they possess an "unusually delicate sensitivity," or even because they may be less physically imposing than some of their male counterparts, but rather because of stereotypical assumptions about the propriety of women exercising authority in traditionally male-dominated occupations.
 
 
 29
 Here, plaintiffs allege that the dissemination of the letters — letters that were not only sexually explicit but violent and demeaning — rendered their workplace environment hostile and greatly weakened their authority over inmates. While some of the remarks plaintiffs attribute to their co-workers might by themselves possibly be characterized as "no more than innocuous badinage of the type to be expected between coworkers of different sexes," Dawson, 274 F.Supp.2d at 376, a hostile environment claim must be evaluated on the basis of the cumulative effect of the abusive conduct. Other alleged remarks by co-workers were of a more insidious tenor. Moreover, in a gender-based hostile work environment case like the one before us, the crucial question is not simply whether the remarks to which plaintiffs were subjected were of an explicitly sexual nature. It is rather whether the workplace atmosphere, considered as a whole, undermined plaintiffs' ability to perform their jobs, compromising their status as equals to men in the workplace. Cf. Hayut v. State Univ. of New York, 352 F.3d 733, 748 n. 7 (2d Cir.2003) (citing Vicki Schultz, The Sanitized Workplace, 112 Yale L.J.2061 (2003)); Gregory v. Daly, 243 F.3d 687, 700 (2d Cir.2001) (citing EEOC v. Farmer Bros. Co., 31 F.3d 891, 898 (9th Cir.1994) (noting that in many circumstances "the employer or supervisor us[es] sexual harassment primarily to subordinate women, to remind them of their lower status in the workplace, and to demean them," and that in such cases, "the `sexual' element of the harassment is only secondary")). As a result, in considering a motion for summary judgment, a court must ask whether a rational fact-finder could conclude, on the basis of evidence in the record, that the conditions of plaintiffs' employment were sufficiently "severe or pervasive" to create an objectively hostile or abusive work environment. Harris, 510 U.S. at 21, 114 S.Ct. 367.
 
 
 30
 As a partial justification for its determination that "plaintiffs are [not] entitled to ... monetary damages," Dawson, 274 F.Supp.2d at 376, the court noted that "several of them," id., took lengthy paid disability leaves to recover from the psychological effects of the alleged harassment. Quite apart from the fact that some of the plaintiffs (so far as the record reflects) did not take disability leave,[7] the court applied an erroneous legal standard. It confused the question of liability with the separate issue of what relief is appropriate in the event that liability is established.
 
 
 31
 To be sure, the fact that some of the plaintiffs took job injury leave allegedly as a result of the events at issue in this case is not wholly irrelevant to the question of liability. But it cuts in the opposite direction from that suggested by the district court. While it is well-established that hostile environment plaintiffs need not demonstrate that they suffered psychological injury in order to state a Title VII harassment claim, see Harris, 510 U.S. at 22-23, 114 S.Ct. 367, evidence that plaintiffs did suffer emotional repercussions and availed themselves of leave in order to seek treatment still bears on the question of liability to the extent that it is "relevant to determining whether the plaintiff actually found the environment abusive," id. at 23, 114 S.Ct. 367.[8] And, of course, if the defendants are eventually found liable, it will be appropriate for a jury to take each individual plaintiff's circumstances into account in calculating the amount, if any, of compensatory damages each is to receive.[9]
 
 
 32
 
 D. Liability of Particular Defendants for Plaintiffs' Various Hostile Work Environment Claims
 
 
 
 33
 Because the district court — erroneously, as we have held — found plaintiffs' evidence of hostile work environment insufficient to survive summary judgment, it did not discuss which if any of the defendants named in this suit are properly subject to liability for violations (a) of Title VII, (b) of the Equal Protection Clause of the Fourteenth Amendment, thereby giving rise to an action under 42 U.S.C. § 1983, or (c) of New York anti-discrimination laws. The harassment alleged by plaintiffs emanated from a variety of sources, including co-workers as well as at least one individual in a supervisory position (Sgt.Banks). The interplay, on the facts in the record, of these different statutes with respect to the various defendants, is not uncomplicated. Notwithstanding our conclusion that it was improper to grant summary judgment to all defendants on the grounds that plaintiffs failed to put forth evidence of an actionable hostile work environment, it may be that certain defendants can establish nonliability as a matter of law on some or all of the plaintiffs' legal theories. These questions would best be examined at the trial court level, perhaps on renewed motions for summary judgment or for partial summary judgment.
 
 
 IV. Conclusion
 
 
 34
 For the foregoing reasons, the district court's grant of defendants' motion for summary judgment on plaintiffs' retaliation claims under Title VII and the First Amendment is AFFIRMED. The district court's grant of summary judgment on plaintiffs' hostile work environment claims under Title VII and Section 1983 is VACATED and the case is REMANDED for further proceedings consistent with this opinion. And plaintiffs' state law claims, over which the district court declined to exercise pendent jurisdiction, are REINSTATED, also for further proceedings. Costs of this appeal will be borne by the defendants.
 
 
 
 Notes:
 
 
 [1]
 It is, however, by no means clear that these last two allegations are supported by admissible evidenceSee Dawson v. County of Westchester, 274 F.Supp.2d 364, 374 n. 9 (S.D.N.Y.2003). We express no view on the matter since our holding does not depend on these assertions.
 
 
 [2]
 Sgt. Banks disputes McFarlane's account of the context in which this incident occurred, but the district court having granted summary judgment to the defendants, we must take McFarlane's description as correct
 
 
 [3]
 Sgt. Bizzarro noted that he had confiscated the letter, after attaching a copy to his report
 
 
 [4]
 The report also indicated that CO Kelli Reckard, who had joined the plaintiffs' complaint and in their request that action be taken against Banks, had rescinded her signature from that letter
 
 
 [5]
 Johnson also alleges that, after she returned from leave, defendants violated an agreement made with Johnson pursuant to a psychiatrist's recommendations, by failing to inform Johnson of Banks' presence near her work space. Although plaintiffs characterize this allegation as relating to Johnson's claim of retaliation, it is more properly considered as supporting her hostile work environment claim
 
 
 [6]
 Since the authors of the letters were never identified, it is, of course, possible that they were not written by inmates. But whether they were or not is not relevant to this case, for what is at issue is the behavior of the plaintiffs' co-workers and supervisors after the letters were written
 
 
 [7]
 The record before us does not reflect that Cherry and Lee took leaves of absence
 
 
 [8]
 In this case, the district court found that plaintiffs did subjectively perceive their work environment to be hostileDawson, 274 F.Supp.2d at 374.
 
 
 [9]
 Needless to say, the issue before us being the propriety of the district court's grant of summary judgment, we take no position on defendants' ultimate liability in this case, let alone on the appropriateness of an award of monetary damages in the event that liability is established