**Robert W. VAN DUNK, Sr., Plaintiff,**

v.

**Christopher ST. LAWRENCE, individually and as an Employee of the Town of Ramapo; Anthony Sharan, individually and as an Employee of the Town of Ramapo; Jayme Kelly, individually and as an Employee of the Town of Ramapo; Ed O'Carroll, individually and as an Employee of the Town of Ramapo; and Town of Ramapo, a New York Municipal Corporation., Defendants.**

No. 07 Civ 01999.

United States District Court, S.D. New York.

March 26, 2009.

George J. Cotz, Suffern, NY, for Plaintiff.

Janice Gittelman, Town of Ramapo, Town Attorney, Suffern, NY, for Defendants.

### Memorandum and Order

WILLIAM G. YOUNG, District Judge.[1]

## I. INTRODUCTION

Plaintiff Robert W. Van Dunk, Sr. ("Van Dunk"), brings six causes of action: (1) a claim pursuant to 42 U.S.C. § 2000e against Christopher St. Lawrence, Anthony Sharan, Jayme Kelly, and Ed O'Carroll for race-based employment discrimination, Pl. Amend. Compl. [Doc. 4] ¶¶ 38–39; (2) a claim pursuant to 42 U.S.C. § 1983 against Sharan, O'Carroll, and Kelly for depriving Van Dunk of his "substantive and procedural due process rights, and his right to equal protection of the laws," id. ¶¶ 40–42; (3) a claim pursuant to 42 U.S.C. § 1985 against Sharon, O'Carroll, and Kelly for conspiracy to "act under color of state law and otherwise to deprive [Van Dunk] of his civil rights," id. ¶¶ 43–44; (4) a claim, pursuant to 42 U.S.C. § 2000e and 42 U.S.C. § 1983, against Sharan, St. Lawrence, and the Town of Ramapo for "[s]upervisory [l]iability" for failure "to adequately train and supervise," id. ¶¶ 45–47; (5) a claim pursuant to 42 U.S.C. § 2000e against the Town of Ramapo, Sharan, O'Carroll, Kelly, and St. Lawrence for creation of a hostile work environment, id. ¶¶ 48–49; and (6) a claim pursuant to Title VII 42 U.S.C. § 2000e against "Defendants or some of them" for retaliation. Id. ¶¶ 50–51.

After Van Dunk withdrew all claims against Kelly [Doc. 8], the remaining defendants (the "Defendants") jointly moved for summary judgment on all claims. Def. Mot. for Sum. Judg. [Doc. 11] at 2. Upon hearing oral argument by the parties on January 8, 2009, this Court granted summary judgment in favor of the Town of Ramapo, and took the motions of the other Defendants under advisement. This memorandum and order addresses those motions.

### A. Procedural Posture

Van Dunk filed his second Amended Complaint on May 8, 2007. [Doc. 4]. On October 9, 2007, Van Dunk filed an Order of Discontinuance dismissing and withdrawing all claims against Kelly. [Doc. 8]. The Defendants filed a motion for summary judgment on January 14, 2008, supported by a memorandum of law ("Defs' Mem."), exhibits, and a statement of facts ("Defs' Facts"). [Doc. 11]. Van Dunk filed an opposition on February 19, 2008. ("Pl's Opp'n") [Doc. 13]. Also on February 19, Van Dunk submitted an affidavit, exhibits, and a counterstatement of facts ("Pl's Facts"). [Doc. 14–16]. The Defendants submitted a Reply Affirmation and a Reply Memorandum in Support of their Motion on February 29, 2008 ("Defs' Reply"). [Doc. 17–18]. Van Dunk filed a further Affidavit in Opposition on April 22, 2008. [Doc. 21]. The Defendants filed an additional Affidavit in Support on that same day. [Doc. 22].

1. Of the District of Massachusetts, sitting by designation.

The case was reassigned to this Court on December 1, 2008. [Doc. 24]. Van Dunk supplemented the record by a letter dated December 4, 2008 [Doc. 25] and submitted an additional affidavit under the title of Motion for Miscellaneous Relief on December 10, 2008. [Doc. 27].

## B. Facts

Van Dunk is a Native American of the Ramapough–Lenape Nation, a tribe inhabiting areas of northern New Jersey and southern New York. Van Dunk Affidavit in Opposition [Doc. 14] ¶ 2. At times, Van Dunk has referred to himself "as 'Black' or 'colored' because it is easier than trying to explain to ignorant people what a Native American is." *Id.*[2]

Van Dunk has been employed by the Town of Ramapo Highway Department ("the Department") since 1977. *Id.* ¶ 3. Beginning as a Laborer, Van Dunk advanced through the ranks of the Department, becoming a Motor Equipment Operator, Grade 2 ("MEO–II") in 2002. *Id.* ¶ 7.

At some point in the 1980's, O'Carroll and Sharan each referred to Van Dunk using racial slurs. *Id.* ¶¶ 5, 27. The record contains no other overtly racially discriminatory conduct by any of the Defendants. Van Dunk maintains that while they occurred long ago, "there is no evidence ... that those remarks did not reveal genuine attitudes held by these decision makers today." Pl's Opp'n at 9. He asserts that these genuine attitudes form the basis for the allegedly discriminatory conduct outlined below.

Between 2001 and 2003, Van Dunk alleges that he was passed over for the position of leading his blacktop crew when the foreman was absent, a practice referred to as "working out of title," for which he would have been paid a bonus of five percent of the day's pay. Van Dunk Affidavit in Opposition ¶ 8. Van Dunk does not state the number of times this happened. He confronted Sharan, then acting General Foreman, about the situation, after which he was allowed to work "out of title" until the Town of Ramapo discontinued the practice. *Id.*

In 2005, Sharan provisionally appointed Van Dunk and another individual, Robert Taylor, to the position of Highway Maintenance Supervisor (HMS–I). Defs' Facts ¶¶ 19–22. Both Van Dunk and Taylor, a Caucasian, failed the Civil Service test required for permanent appointment to the HMS–I position, and were removed. *Id.* ¶¶ 23, 26. Van Dunk alleges that Sharan's "harassment," detailed below, during his provisional appointment resulted in his failure on the exam. Van Dunk Affidavit in Opposition ¶ 12. Van Dunk thereafter resumed his MEO–II position. Defs' Facts ¶ 28. William Polen, an African American, was later appointed, passed the Civil Service test, and currently holds the HMS–I position permanently. *Id.* ¶¶ 29–31.

Van Dunk categorizes a number of incidents that occurred, both during and after his provisional appointment, as discriminatory harassment. In February of 2006, while holding the provisional HMS–I position, Van Dunk was issued a Ford Explor-

2. In 2007, the New Jersey Committee on Native American Community Affairs, which was charged with looking into a wide spectrum of issues affecting Native American tribes in New Jersey, reported hearing testimony that American Indians, including those from the Ramapough–Lenape tribe, had suffered "institutional racial discrimination, which was reminiscent of the pre-civil rights era," and that many had been "raised to hide their Indian identity for fear of ridicule and abuse." New Jersey Committee on Native American Community Affairs, *Report to Governor Jon S. Corzine* 45 (December 17, 2007), http://www.state.nj.us/governor/pdf/Native_American_Committee_Report.pdf.

er as a supervisory vehicle, allegedly with bald tires. Van Dunk Affidavit in Opposition ¶ 10(a). Frank Albaugh, Ramapo's Garage Manager, refused to replace the tires, stating that the vehicle was due to be retired and was safe as-is. *Id.* Van Dunk brought his request to Sharan, who took the vehicle to a local tire dealer for a second opinion; the dealer confirmed that the tires were safe. *Id.* Van Dunk next brought his complaint to St. Lawrence, the Town Supervisor, who ordered Albaugh to replace the tires, after allegedly referring to Albaugh as a racist. *Id.* Van Dunk filed a complaint with Linda Condon, Ramapo's Affirmative Action Officer, about the incident with Albaugh. Affidavit of Linda Condon ("Condon Affidavit") [Doc. 11 Attach. 5 at Ex. F] at ¶ 7. Condon determined that Albaugh's "refusal to replace the tires was due to his belief that they were safe for short term use and that a new truck was being ordered for [Van Dunk's] use." *Id.* ¶ 8.

Van Dunk also alleges that Sharan accused him of "stealing" overtime by putting in three hours for each of his weather call-outs in the winter of 2006; he further states that this policy was followed without incident by all of the Department's white supervisors. Van Dunk Affidavit in Opposition ¶ 10(e). Sharan states that he merely discussed the proper way to bill overtime with Van Dunk, and did not accuse him of stealing. Sharan Affidavit [Doc. 11 Attach. 2 at Ex. B] at ¶ 12. Both parties agree that the policy outlined at that meeting, and in a subsequent memorandum, has been followed consistently by all supervisors since that time. Van Dunk Affidavit in Opposition ¶ 10(e); Sharan Affidavit at ¶ 12.

After relinquishing the HMS–I position, Van Dunk took over the Department's MEO–II/Signs position. Van Dunk Affidavit in Opposition ¶ 13. Van Dunk alleges that Kelly, who formerly held the position, failed to train him properly for his new position, and that his complaints about this failure went un-investigated. *Id.* at ¶¶ 13–14.

In February 2007, Van Dunk complained to Condon of another incident involving Kelly. He claims that Kelly and two other Department employees "entered his office and vandalized or ransacked his desk." Condon Affidavit at ¶ 11. Condon and the Town Attorney conducted an investigation into this complaint, and found that Kelly had left a paper beverage cup upon Van Dunk's desk. *Id.* Kelly was later removed from the HMS–I position for failure to serve his probationary period in a satisfactory manner. *Id.*

In March 2007, O'Carroll tasked Van Dunk with riding on the back of a garbage truck during the annual pre-Passover cleanup of the Monsey neighborhood of the town. Van Dunk claims that such a task is below the grade of an MEO–II, and that only he and another Native American MEO–II were made to do so. Van Dunk Affidavit in Opposition ¶ 20. The Defendants maintain that such manual labor is consistent with the routine tasks of an MEO–II. The job description of that position provides that, among other "Typical Work Activities," an MEO–II "[p]erforms a variety of unskilled and semi-skilled laboring tasks as required." [Doc. 11 Attach. 7 at Ex. O].

At various times in 2007, Van Dunk alleges that he was tasked with operating a soil separator by himself, a task he claims should have been delegated to two or three individuals. Van Dunk Affidavit in Opposition ¶ 33.

In the spring of 2007, Van Dunk alleges that O'Carroll "loudly and publicly berated [him] for getting the floor wet" while washing his sign repair vehicle in the Town Garage. *Id.* ¶ 29.

In 2008, Van Dunk alleges that, on two different occasions, copies of his "confidential documents" were left in the Highway Department lunch room and posted on a notice board. *Id.* ¶¶ 21, 24. Van Dunk does not claim to know the identity of the individual who placed the documents, but claims that Sharan was the only person with access to them. *Id.* ¶ 21.

### C. Federal Jurisdiction

This Court has jurisdiction to hear claims arising under 42 U.S.C. § 2000e, 42 U.S.C. § 1983, and 42 U.S.C. § 1985.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment has the responsibility "of informing the district court of the basis for its motion" and pointing out those portions of the record it believes "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. *Id.* If the moving party meets this burden, the non-moving party must provide "specific facts showing there is a genuine issue for trial." *Id.*

### B. Time–Barred Complaints

■ Van Dunk filed an EEOC complaint chronicling his grievances with the Defendants on April 21, 2006. [Doc. 11 Attach 7 at Ex. P]. Several of the alleged incidents, including the racial comments made by Sharan and O'Carroll, occurred in the 1980s. Discrimination charges must be filed with the EEOC within 180 days of the alleged incident. *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir.1996). As a result, claims predating those found in the EEOC complaint are time-barred.

### C. Title VII Claim

■ A Title VII claim requires a plaintiff to demonstrate: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4), circumstances that support an inference of discrimination." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

Van Dunk has satisfied the first element by showing that he is a member of a protected group. The remaining elements, however, prove more problematic.

■ First, Van Dunk has not shown himself to be qualified for the positions he has sought, particularly the HMS–I post. All parties acknowledge that permanent appointment to the position was conditional upon passage of the Civil Service test that Van Dunk failed. As a result, he cannot claim to have been qualified for the position.

■ Further, Van Dunk has not alleged any facts that would tend to show that he suffered an "adverse employment action." An adverse employment action must rise to a level of disruption above "mere inconvenience or an alteration of job responsibilities." *Allen v. Advanced Digital Info. Corp.,* 500 F.Supp.2d 93, 107 (N.D.N.Y. 2007) (quoting *Galabya v. New York City Bd. Of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000)). The record as it stands does not support the notion that Van Dunk suffered

any such actions. Several of the incidents offered to demonstrate adversity, such as the "barrage of work orders," were not committed by any of the Defendants, but by Kelly, against whom Van Dunk is no longer pursuing a claim. Pl's Opp'n at 8. Others, including the outdoor work assignment and trash collection, while definitely at the lower end of the MEO–II skill spectrum, are considered typical duties of the position.

■ Additionally, Van Dunk has failed to demonstrate the existence of circumstances supporting an inference of discrimination. William Pollen, an African–American male, was appointed by Sharan to the HMS–I post, and now holds it permanently after passing the Civil Service test. The only incidents of overt racial discrimination in the record are single statements made by Sharan and O'Carroll over a decade ago. Essentially, Van Dunk asks this Court to couple those statements with several assignments, such as the Monsey trash clean up, and supervisor interactions, including the tire incident, to determine that the circumstances of his employment support an inference of discrimination. He provides several precedents for doing so, but an examination of these precedents will show that they are not analogous to the case at hand.

Van Dunk points to *Feingold v. New York*, 366 F.3d 138 (2d Cir.2004) as support for the idea that "less desirable assignments are racially discriminatory." Pl's Opp'n at 10. The facts in this case, however, differ significantly from *Feingold*. In *Feingold*, the plaintiff, a homosexual Jewish male, was subjected to repeated remarks about his religion and sexual orientation; indeed, "nearly every conversation" with his superiors involved a reference to his religion. *Feingold*, 366 F.3d at 146. Furthermore, these statements were made in close proximity to Feingold's termination. These circum-

stances are significantly different than those surrounding Van Dunk's employment, both in the degree of discriminatory animus that reasonably can be inferred, and in the severity of the adverse employment action taken. As such, it serves as a poor guide to judge the circumstances in the present case.

Similarly unhelpful is *International Healthcare Exchange, Inc. v. Global Healthcare Exchange LLC,* 470 F.Supp.2d 345 (S.D.N.Y.2007) (Swain, J.), submitted for the purpose of showing that "assignments below grade can be discriminatory." Pl's Opp'n at 10. The plaintiff in *International Healthcare Exchange,* a female, was hired as "Director, International Business" and tasked with substantial amounts of clerical work, including typing meeting minutes. *Int'l Healthcare Exch.,* 470 F.Supp.2d at 352–53. According to the defendant employer, these assignments were made as a result of the start-up nature of the venture, and an assumption by the employer that all employees would aid in clerical work; the plaintiff claimed her tasks were a result of discriminatory gender stereotyping. *Id.* at 353.

Van Dunk's case is quite different, in that his "below grade" assignments were within the range of typical tasks for his position. Unlike *International Healthcare Exchange,* the Court need not make this judgment based upon assumptions about Van Dunk's employment; the MEO–II job description sets out unskilled labor as one of the typical job activities of the position. Consequently, *International Healthcare Exchange* is also a poor precedent for the case at hand.

Even when construing all the facts in his favor, Van Dunk has not demonstrated circumstances supporting an inference of discrimination. Coupled with his inability to demonstrate his qualification for the positions sought, or adverse employment

actions, summary judgment on this claim is granted for the Defendants.

### D. Section 1983 Claims

■ Under section 1983, an individual may not be held liable "merely because he held a high position of authority, but can be held liable if he was personally involved in the alleged deprivation." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir.2004) (internal quotation omitted). To show personal involvement, a plaintiff may produce evidence that: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

■ There are a number of difficulties with Van Dunk's individual claims against Sharan and O'Carroll. First, "when [section] 1983 is used as a parallel remedy with Title VII in a discrimination suit, as it is here, the elements of the substantive cause of action are the same under both statutes." *Jemmott v. Coughlin*, 85 F.3d 61, 67 (2d Cir.1996) (citing *Risinger v. Ohio Bureau of Workers' Comp.*, 883 F.2d 475, 483 (6th Cir.1989); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 898 (1st Cir.1988); *Nilsen v. City of Moss Point*, 701 F.2d 556, 559 n. 3 (5th Cir.1983) (en banc)). As a result, for the same reasons discussed under the Title VII claim, summary judgment is appropriate for the section 1983 claim.

■ Additionally, the Defendants have asserted a defense of qualified immunity. Under this doctrine, municipal officers are free from liability if they show either that their actions "did not violate clearly established rights of which a reasonable person would have known, or that it was objectively reasonable to believe that their acts did not violate these clearly established rights." *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir.1993) (internal quotation omitted). Assuming, as required, that all of Van Dunk's allegations are accurate, each of the individual Defendants would still be protected under the doctrine of qualified immunity. The allegedly discriminatory actions of which each stands accused include: assigning Van Dunk to trash collection, assigning him to work on a soil separator, correcting his overtime billing practices, and asking him to discontinue distribution of notices to residential mailboxes. The first two actions consist of assigning Van Dunk to work activities considered typical of his position, and as such, it is objectively reasonable to believe that such assignments would not constitute a violation of Van Dunk's clearly articulated right to be free from racial discrimination in the work place. Regarding the other alleged incidents, while nothing in the record dictates exactly how corrections regarding performance of job functions are to be carried out, it is also objectively reasonable for Sharan and O'Carroll to believe that simple corrections would not violate Van Dunk's constitutional rights. As a result, qualified immunity applies to each of the individual Defendants. Since the individual Defendants would not have been on notice that their actions would be clearly unlawful, summary judgment based on qualified immunity is appropriate, and is granted. *See Pearson v. Callahan*, —— U.S. ——, 129 S.Ct. 808, 822, 172 L.Ed.2d 565 (2009); *Saucier v. Katz*, 533 U.S. 194,

202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

### E. Section 1985 Claims

 A claim brought under section 1985(3) must contain the following elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." *Mian v. Donaldson, Lufkin, & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993) (citing *United Bhd. of Carpenters and Joiners of Am., Local 610, AFL–CIO v. Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)). Furthermore, section 1985 conspiracy claims are held to a heightened pleading standard. *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir.1993). Finally, "[c]laims of conspiracy that are vague and provide no basis in fact must be dismissed." *Conway v. Garvey*, No. 03 Civ. 7958(DC), 2003 WL 22510384, at *3 (S.D.N.Y. Nov. 3, 2003) (Chin, J.).

Van Dunk has failed, both in his Amended Complaint and opposition brief, to allege any facts that would suggest a meeting of the minds took place between Sharan and O'Carroll regarding any deprivation of a federally protected right. Absent evidence of such an agreement, and given the heightened pleading standard, summary judgment is appropriate and is granted on Van Dunk's section 1985 claim. *See Gibbs–Alfano v. Ossining Boat & Canoe Club, Inc.*, 47 F.Supp.2d 506, 513–14 (S.D.N.Y.1999) (McMahon, J.).

### F. Hostile Work Environment Claim

 In evaluating a claim of hostile work environment, this Court must determine "whether a rational fact-finder could conclude, on the basis of the evidence in the record, that the conditions of [plaintiff's] employment were sufficiently 'severe or pervasive' to create an objectively hostile or abusive work environment." *Hayes v. Kerik*, 414 F.Supp.2d 193, 207 (E.D.N.Y. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). In so determining, this Court must "look to the totality of the circumstances." *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir.2004). Factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hayes*, 414 F.Supp.2d at 207 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367).

Analysis of Van Dunk's hostile environment claim is complex. The "totality of the circumstances" standard set out in *Dawson* requires a detailed analysis of sometimes subtle factors, and the Second Circuit provides limited guidance beyond the statements above. Recent district court cases, however, provide some assistance. In *Stepheny v. Brooklyn Hebrew School for Special Children,* defendants were granted summary judgment on a hostile work environment claim despite repeated, recent racial comments made by an employee. *Stepheny v. Brooklyn Hebrew Sch. for Special Children,* 356 F.Supp.2d 248, 264 (E.D.N.Y.2005). Summary judgment also was granted in a similar situation in the Southern District of New York, and affirmed by the Second Circuit. *See De La Concha v. Fordham Univ.*, No. 98–7786, 1999 WL 197210, at *2 (2d. Cir. Mar. 26, 1999).

 Given this guidance, summary judgment is appropriate in Van Dunk's case. Based on the facts provided in the record, even when viewed in the light most favorable to Van Dunk, there is no basis

for believing that the environment in Ramapo's Highway Department was so racially hostile to qualify as "severe and pervasive" for the purposes of a Title VII claim. The only overtly racial statements by anyone involved in this action were made decades ago, and the only potentially adverse actions taken against Mr. Van Dunk reasonably can be construed as legitimate workplace discipline or the valid assignment of typical work tasks. Furthermore, the idea that the environment was objectively hostile is undermined by the promotion of William Polen, an African-American, to the HMS–I position. As a result, summary judgment in favor of the Defendants is granted.

### G. Retaliation Claims

■ Under Title VII, a prima facie case of retaliation requires an employee to show "(1) that he or she participated in a protected activity known to the defendant; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action." *Hayes,* 414 F.Supp.2d at 205 (citing *Terry v. Ashcroft,* 336 F.3d 128, 141 (2d Cir.2003)). Additionally, the retaliatory motive "must be 'at least a substantial or motivating factor behind the adverse action.'" *Id.* at 205 (quoting *Raniola v. Bratton,* 243 F.3d 610, 625 (2d Cir.2001)).

■ It is clear from the record that Van Dunk participated in a number of protected activities, including his internal complaints and his complaint with the Human Rights Commission. His case for retaliation, however, becomes more difficult when considering the remaining two elements. First, it is unclear what would constitute the required adverse employment action. In each case cited to support his position, the plaintiff's "adverse employment action" consisted of termination. Van Dunk, in his opposition brief, points to

being "embarrassed", as well as being tasked with "hanging from the back of a garbage truck." Pl's Opp'n at 15. Neither of these incidents approach the level of adversity found in a case of termination, or of demotion, or even of reduction in pay. Additionally, the latter incident is a task consistent with Van Dunk's job description. While these actions did occur in close temporal proximity to the protected actions Van Dunk engaged in, they do not appear to constitute "adverse employment actions" that would be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Allen,* 500 F.Supp.2d at 107. As such, summary judgment is granted on the retaliation claim.

## III. CONCLUSION

It is true that Van Dunk was subjected to derogatory, hateful remarks by defendants Sharan and O'Carroll. These incidents, however, happened over a decade ago, and both individuals have been disciplined for their actions. With regard to the case at hand, Van Dunk has failed to provide evidence to support the basic elements of each of his claims. As a result, the Defendants' motion for summary judgment [Doc. 11] is GRANTED.

SO ORDERED.